## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Max Sullivan, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a warrant to search the premises located at 324 4th Avenue, Tiffin, Ohio 44883 (**TARGET LOCATION 1**), which is more particularly described in Attachment A-1, and the premises located at 212 E. North Street, Fostoria, Ohio 44830 (**TARGET LOCATION 2),** which is more particularly described in Attachment A-2. I submit that there exists probable cause to believe that now located in**, TARGET LOCATION 1** and **TARGET LOCATION 2** is contraband, evidence, fruits, and instrumentalities of violations Title 26, United States Code, Section 7201 (Tax Evasion).

2.      I am employed as a Special Agent (SA) with the Internal Revenue Service, Criminal Investigation ("IRS-CI"), and have been employed in this capacity since February 2019.  I am assigned to the Cincinnati Field Office. I am a Certified Public Accountant, in good standing, licensed in the state of Ohio. I am a graduate of the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. I have received training and gained experience in various aspects of criminal investigation, including criminal law, criminal tax law, tax evasion, employment tax fraud, money laundering, wire and mail fraud, and various financial investigative techniques. Prior to becoming a Special Agent, I was employed as a tax manager for six years at a public accounting firm and as a Revenue Agent with the Internal Revenue Service for three years.

3.      Based on my training and experience, and discussion with other law enforcement officers, I know that it is common for individuals who are running a business (whether lawful business, wholly illicit business, or lawful business which commit unlawful activities related

thereto) to maintain records related to the business in their residence and business locations. These records include: receipts for expenditures by cash and check, bank records, and other financial documents, customer files, records memorizing the sale/distribution of their product, or service and correspondence with actual or prospective customers. Furthermore, individuals engaged in an income-producing business often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time.

4.      There are many reasons why criminal offenders maintain evidence for long periods of time.  First, to the offender, the evidence may seem innocuous at first glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software).  To law enforcement, however, such items may have significance and relevance to the subjects when considered in light of other evidence. Second, the criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence.  The criminal offender may also be under the mistaken belief that he/she has deleted, hidden, or further destroyed computer-related evidence, which in fact, may be retrievable by a trained forensic computer expert.

5.      I am familiar with the methods and practices used by individuals and income producing organizations to evade the assessment of taxes.  These methods include cash purchases, the use of nominees, the use of businesses as "fronts" in an attempt to conceal their

income, and the use of safe deposit boxes as part of an effort to conceal business earnings and cash from the public and/or law enforcement.

6.      I am being assisted in this investigation by law enforcement officers with the U.S. Department of Homeland Security, United States Customs and Border Protection, United States Border Patrol (USBP). The information set forth in this affidavit is based on my personal observations, technical analysis, my training and experience, and information obtained from other agents and witnesses with whom I have conferred.

7.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## SYNOPSIS OF INVESTIGATION

### i.  Background Information related to MATT PEACE and JUDENA CRAIG's Pallet Company

8.      As set forth in detail below, information obtained during this investigation indicates that MATT PEACE (PEACE) and JUDENA CRAIG (CRAIG):

   a.  Are in a relationship;

   b.  Together, live in **TARGET LOCATION 2;**

   c.  Own and/or operate DJ's PALLET SURPLUS LLC dba INDEPENDENT PALLET aka INDEPENDENT OH LOGISTICS LLC located at **TARGET LOCATION 1;**

   d.  Are business partners with Luke Cavanaugh, an owner of various pallet and logistics companies residing in New Jersey;

   e.  Appear to be engaged in a scheme to smuggle aliens from Texas to repair and make pallets for DJ'S PALLET SURPLUS LLC dba INDEPENDENT PALLET; and

   f.  Failed to report the income from their pallet factory operations on a Federal Income Tax Return and willfully evaded the assessment of Federal Income Tax.

3

9.      Records obtained from PNC Bank on March 16, 2023, pursuant to a grand jury subpoena indicate Luke Cavanaugh:

    a.   Resides in Mullica Hill, New Jersey;

    b.   Owns INDEPENDENT OH LOGISTICS LLC with an address in Glassboro, NJ;

    c.   On April 22, 2022, opened business checking accounts with PNC Bank for INDEPENDENT OH LOGISTICS with sole signature authority;

    d.   Together, with his mother Donna Cavanaugh own INDEPENDENT FREIGHT, LLC with an address in Camden, NJ;

    e.   On June 19, 2017, opened business checking accounts with PNC Bank for INDEPENDENT FREIGHT, LLC with joint signature authority with Donna Cavanaugh;

    f.   Together, with his mother Donna Cavanaugh and Joseph Chambers own INDEPENDENT PALLETS with an address in Camden, NJ; and

    g.   On August 14, 2017 opened business checking accounts with PNC Bank for INDEPENDENT PALLETS with joint signature authority with Donna Cavanaugh and Joseph Chambers.

10.     Based on my training and experience, as well as information set forth in this affidavit, I believe that Luke Cavanaugh and his companies, INDEPENDENT FREIGHT, INDEPENDENT OH LOGISTICS, and INDEPENDENT PALLETS are front companies for PEACE and CRAIG's pallet company, DJ'S PALLET SURPLUS.

11.     Bank records show that on December 13, 2017, CRAIG opened a business checking account in the name of DJ'S PALLET SURPLUS at First Financial Bank in Fostoria, Ohio. Records indicate that CRAIG initially told the banker that she ran a pallet business, but later she clarified that her boyfriend, PEACE, really owned the business but he does not like anything in his name.

12.     On July 26, 2021, PEACE transferred ownership of 212 E. North St. (**TARGET LOCATION 2**) to CRAIG via Quit Claim Deed.

13.     On December 14, 2021, CRAIG incorporated DJ'S PALLET SURPLUS LLC as a limited liability company with the Ohio Secretary of State. CRAIG is both the statutory agent and the member/manager/representative. The registered address is 212 E. North St. (**TARGET LOCATION 2).**

14.     On December 20, 2021, PEACE, representing INDEPENDENT PALLET, appeared before Tiffin City Council and requested an incentive through the city's New Jobs Program, administered by the Seneca Industrial & Economic Development Corp. PEACE represented that INDEPENDENT PALLET would occupy the facility located at 324 4th Ave., Tiffin, Ohio (**TARGET LOCATION 1**) and immediately create approximately 30 new jobs.[1]

15.     A press release published by the Tiffin Seneca Economic Partnership on December 21, 2021, detailed a plan for INDEPENDENT PALLET to invest $2.6M into a new pallet manufacturing operation at **TARGET LOCATION 1.** The plan indicated that INDEPDENT PALLET planned to hire 30 employees, both laborers and drivers, and expected to employ 150 employees over the next three years. The press release included a quote from "owner" Luke Cavanaugh and "partner and developer" PEACE.

16.     In June of 2022, a cooperating witness (CW-1), called the Sandusky Bay Border Patrol Station (SBY) to report suspicious activity at a pallet factory located at **TARGET LOCATION 1**. CW-1 claimed that each day at approximately 8:00 am, a van arrives at the pallet factory carrying Spanish speaking individuals who wear dark shades and masks before

---

[1] Your affiant was made aware of this incentive deal through review of the city council meeting minutes posted on Youtube. In order the preserve the secrecy of the investigation, a subpoena has not yet been served on the City of Tiffin seeking all the records related to this incentive.

entering the factory. CW-1 reported that at lunch time, the individuals are seen congregating underneath semi-trucks without eating.

17.     On August 02, 2022, another cooperating witness (CW-2), called SBY to report that 20-30 illegal aliens were living at 219[2] Potter St. in Fostoria, OH and that they are working at a pallet factory in Tiffin, OH. CW-2 stated that PEACE and CRAIG are responsible for bringing the illegal aliens from Texas to Ohio.  On February 28, 2023, investigators contacted CW-2 to further investigate the claims. CW-2 stated that CRAIG once offered CW-2 $1,000 dollars to drive to Texas and pick up undocumented aliens. CW-2 stated that CW-2 declined the offer, but is aware of CRAIG making the same offer to other people in the Fostoria area.

18.     On August 24, 2023, your affiant contacted CW-2. CW-2 stated that 25 or more aliens are still living at the Potter St. address because she witnessed groups of people loitering outside the home approximately two weeks ago when she drove past the home.

19.     On August 10, 2022, law enforcement officers interviewed D.A., an inmate at the Seneca County Jail who stated that in June 2022, he, and a group of 13 individuals, many of whom were in the United States illegally, were picked up at a Houston area Home Depot and driven to a pallet factory in Tiffin, Ohio. A Hispanic female named Juliana was one of the drivers. Upon arrival at the factory, PEACE, the factory's boss, instructed the individuals to work a full day before taking them to Walmart to buy food, clothing and air mattresses. The individuals were then taken to an apartment, located near Marcos Pizza and Dollar General,[3]

---

[2] I believe CW-2 meant the aliens were living in 217 Potter St. Seneca County property records indicate that 219 Potter St. does not exist, while 217 Potter St. is owned by CRAIG.

[3] 217 Potter St. is located within hundreds of feet from a Marcos Pizza and Dollar General.

where 25 individuals were living. All 25 individuals worked at the pallet factory. Each morning PEACE would enter the apartment to wake up the occupants and transport them in three vehicles to the pallet factory. Workers were paid $1 per pallet. D.A. stated that all the workers that lived in the house together were all paid in cash for their work, but other factory workers who did not live in the house were paid via check.

20.     Open-Source Intelligence (OSINT) shows that CRAIG is friends on Facebook with Juliana Garcia. On her Facebook page, Juliana Garcia references a trip to Texas which coincides with the information D.A. provided. OSINT shows that Juliana has a boyfriend named Sidney Sharp who resides with her at an apartment in Fostoria.

21.     On August 16, 2022, Tiffin Police informed investigators that they observed a white van with Ohio plates GXFXXXX, being used to drive suspected illegal immigrants to the pallet factory at **TARGET LOCATION 1.**  The van is registered to Enterprise rental company. OSINT shows that Sidney Sharp rented the van from June 9, 2022, to July 21, 2022. Investigators searched the plates in law enforcement databases which revealed twenty License Plate Reader (LPR) hits for the van in Texas during the time Sidney Sharp rented the van.

22.     On August 24, 2022, Fostoria Police provided investigators with a copy of a dash camera video from an encounter with PEACE. The video shows PEACE telling the officer that he makes $47,000 to $57,000 a week, he gets his workers from "the soul asylum" in Houston, and that he pays his workers cash.  PEACE claims to pay his workers $18/hr and provides their food and housing because "have to, the Government says, or I can't work 'em. If you go get 'em, you have to provide for them. Because they're asylum seekers. There, they have nothing. When I picked them up, they had this." PEACE then points to his clothing.

23.     On August 16, 2022, law enforcement officers conducted Surveillance at 217 Potter St. and observed approximately 15 individuals exiting the apartment at approximately 6:00 am and entering the back of various pickup trucks. At 7:00 am, one of the same pick-up trucks was later spotted parked outside the pallet factory located at **TARGET LOCATION 1**.

24.     On September 15, 2022, Ohio State Highway Patrol (OSHP) troopers, along with USBP agents, conducted a vehicle stop on one of the pickup trucks that was transporting individuals from 217 Potter Street to the pallet factory.  During the vehicle stop, thirteen subjects in the vehicle admitted to USBP agents that they were residing in the United States illegally, and two claimed to be United States citizens.  During the vehicle stop, four of the subjects provided identification which was later run through law enforcement databases.  The checks revealed that the four subjects had no lawful status to reside nor work in the United States.  No enforcement action was taken because there was an ongoing investigation.

25.     Investigators searched CRAIG and PEACE's information through law enforcement databases which revealed that CRAIG was a passenger during an OSHP vehicle stop of Travis Bulger on November 18, 2012, in Fostoria, Ohio.  During the vehicle stop, $45,000 of United States currency was seized.  CRAIG was released from the traffic stop.

26.     Investigators searched Travis Bulger's information through law enforcement databases which revealed that on December 14, 2016, Bulger was convicted of Trafficking in Drugs and sentenced to eleven years in prison. Bulger is currently an inmate at the Marion Correctional Institution in Marion, Ohio. Investigators searched Bulger's jail calls from the Marion Correctional Institution which revealed that he has frequent contact with CRAIG. Further searches of law enforcement databases revealed that PEACE and CRAIG were in contact with Jason Lenz, an inmate at the Lorain Correctional Institution in Grafton, Ohio.

27.     During a jail call between Jason Lenz and PEACE on September 2, 2022, PEACE says "I am trying to get it on paper so that we can start filing the taxes when we are supposed to instead of letting people hide our money because if we aren't on paper, we can't really show our wealth. We can't do nothing. We made 2.7 million dollars this year, all I can show you is my bank account. I can't show it to the government, you know what I mean."

28.     During a jail call between Travis Bulger and CRAIG on May 12, 2023, CRAIG says "like my cars are in my company name, Matt's truck is in Luke's company name because Luke had to buy that for Matt.  It was like ninety-six thousand."   Your affiant believes "Luke" to be Luke Cavanaugh and "Matt" to be PEACE.

29.     On August 30, 2023, at approximately 7:08 am, agents with IRS-CI initiated surveillance at **TARGET LOCATION 1** and observed eight males appearing to be of Hispanic ethnicity exit a black Ford SUV, Ohio license plate JYTXXXX and enter **TARGET LOCATION 1.** A search of a law enforcement database revealed that an apparent business name was listed for the black Ford SUV but no personally identifying information was listed. I know from training and experience, and consulting with officers with USBP, that aliens living in the State of Ohio without proper immigration documents often apply for vehicle registrations using synthetic business names to conceal their true personally identifiable information from the Ohio BMV and other authorities.

**ii.     Key Bank Checking Account Analysis**

30.     Your affiant obtained records from Key Bank account number XXX2516 in the name of CRAIG for the period April 17, 2020, through February 28, 2023. The records consisted of the signature card, statements of account, deposit items and withdraws. The address listed on the bank signature card and all the monthly bank statements is **TARGET LOCATION 2.**

31.     The signature card reflected that the account was opened on or about April 17, 2020, by CRAIG, who has sole signature authority.

32.     From about July 17, 2020, through January 27, 2023, approximately $2,318,330.46, not including account transfers, was deposited into account XXX2516. A majority of the deposits are sourced from various pallet companies including approximately $1,911,551.84 from INDEPENDENT FREIGHT or INDEPENDENT OH LOGISTICS.

33.     A sampling of deposited checks indicates that the funds being deposited into account XXX2516 are sourced from the sale of pallets.

Examples include:

    a.  Check 3377 for $550.00 drawn off INDEPENDENT PALLETS dated June 18, 2020, indicates "Pallets" in the memo line.

    b.  Check 2477 for $1,000 drawn off INDEPENDENT PALLETS dated June 24, 2020, indicates "Pallets" in the memo line.

    c.  Check 6786 for $3,000 drawn off INDEPENDENT PALLETS dated June 24, 2020, indicates "commission" in the memo line.

    d.  Check 2936 for $3,000 drawn off Moore's Pallets dated June 09, 2021, indicates "Pallet purchase" in the memo line.

    e.  Wire transfer from INDEPENDENT PALLETS LLC dated April 22, 2022, for $10,000 referenced Pallet Purchases in the remittance line.

    f.  Wire transfer from Was Broken Pallet Co dated April 29, 2022, for $17,500 references Notched Stingers in the remittance line. I know, based on my training, experience and knowledge obtained during this investigation, that notched stringers are a type of pallet.

34.     From on or about June 2022, the initial period when CW-1 reported suspicious activity detailed in paragraph 16, through January 27, 2023, approximately $808,459.80 was deposited into account XXX2516 from the sale of pallets to various pallet companies.

35.      CRAIG deals in large amounts of currency. From September 2021 through February 2023, CRAIG made approximately 77 cash withdraws totaling approximately $500,000 from her personal bank account.

**iii.      SAFE DEPOSIT BOX 01136**

36.      Information provided by Key Bank shows that CRAIG opened safe deposit box 01136 at the Fostoria Countyline Key Bank on February 18, 2022. According to the safe deposit box rental application, CRAIG is the sole individual authorized to access the safe deposit box. According to the safe deposit box access log for safe deposit box 01136, only CRAIG has accessed the safe deposit box since the safe deposit box was first opened. The address listed on the rental application is **TARGET LOCATION 2.**

37.      According to information provided by Key Bank, CRAIG typically accesses the safe deposit box a few minutes after making a currency withdrawal from the teller.

38.      Below is the analysis of each date that CRAIG accessed safe deposit box 01136 and the corresponding teller withdrawal made a few minutes before:

| Safe Deposit Box Access Date | Teller Withdrawal Amount |
|---|---|
| 02/18/2022 | (*Account Open Date*) |
| 02/25/2022 | $5,000.00 |
| 03/15/2022 | $5,000.00 |
| 03/18/2022 | $18,691.00 |
| 03/25/2022 | $31,138.00 |
| 04/01/2022 | $27,085.00 |
| 04/07/2022 | $29,445.00 |
| 04/22/2022 | $32,422.50 |
| 04/29/2022 | $29,898.00 |
| 06/17/2022 | $18,468.00 |
| 07/01/2022 | $20,279.00 |
| 07/08/2022 | $29,050.00 |
| 07/29/2022 | $22,450.00 |
| 02/03/2023 | $7,000.00 |
| 02/10/2023 | $6,000.00 |

39.     Based on my training, experience, I know that people engaged in tax evasion often store the proceeds from their income producing business and other records/documents related to their business activities in a safe deposit box as part of an effort to conceal those proceeds or records from the public and/or law enforcement.

**iv.     Payroll Records**

40.     Payroll records received on August 23, 2023, pursuant to a subpoena served on ADP, indicate that CRAIG received a Form 1099-NEC Nonemployee Compensation from INDEPENDENT FREIGHT reporting $607,992.04 for tax year 2022. In addition, CRAIG received a Form W2 Wage and Tax Statement from INDEPENDENT OH LOGISTICS reporting $372,475.60 for tax year 2022. However, the federal income tax withheld from CRAIG's wages was $212.92.

41.     Employers who pay wages to their employees are required to withhold federal income taxes from employee's paychecks and deposit the withheld income tax with the IRS. In general, the withholding rate varies by taxpayer and depends on the amount earned and the information provide to the employer on a Form W-4, such as number of dependents and filing status. The IRS provides employers with guidelines for federal income tax amounts to withhold from employee's paychecks in the form of withholding tables. These withholding tables suggests that a single taxpayer earning $372,475.60 in wages should withhold approximately $103,831.46 annually from their payroll checks.

42.      Based on my training and experience, individuals who commit tax fraud, including tax evasion, seek to withhold as little federal income tax as possible from their wages because they do not want to pay tax to the government.

12

**v.**    **Internal Revenue Service Records**

43.    Your affiant has reviewed IRS records which show that PEACE has not filed federal Form 1040 U.S. Individual Income Tax Return (Form 1040) since tax year 2010.

44.    On October 12, 2023, CRAIG filed a tax year 2022, Form 1040 with the IRS reporting the $372,477 in wages earned from INDEPENDENT OH LOGISTICS resulting in a tax due and owing of $99,587. CRAIG failed to report any of the income earned from INDEPENDENT FREIGHT, including the $607,992.04 noted in paragraph 40 or any income earned from DJ's PALLET SURPLUS.

45.    CRAIG has not filed any other Form 1040s from 2012 through 2021 and has not reported any income to the IRS during those years.

46.    The IRS has no record of any income tax or payroll tax returns for DJ'S PALLET SURPLUS except for a single Form 941, Employer's Quarterly Federal Income Tax Return reporting 10 employees for the tax period April 01, 2023, through June 30, 2023.

47.    INDEPENDENT OH LOGISTICS LLC reported wages paid to 54 employees, including CRAIG, in tax year 2022. The business address listed for all the INDEPENDENT OH LOGISTICS Form W2s is **TARGET LOCATION 1.** The average wage, not including CRAIG's wages, was $11,517. None of the reported employees had an address at 217 Potter Street.

48.    Neither DJ'S PALLET SURPLUS nor INDEPENDENT OH LOGISITCS reported any income or wages paid to D.A., despite D.A. telling investigators that he was employed making $1 per pallet as noted in paragraph 19 above.

49.    Based on my training and experience, individuals residing and working in the United States illegally often struggle to deposit payroll checks due to an actual and/or perceived

13

lack of access to traditional banking. As such, employers who pay illegal aliens often pay these individuals in cash and fail to report the wages paid to the IRS on any payroll tax returns.

## COMPUTERS, CELL PHONE, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

50.     Based on my training and experience, I use the following technical terms to convey the following meanings:

     a.  Computer: All types of electronic, magnetic, optical, electrochemical, or other high- speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

51.     As described above and in Attachment B, this application seeks permission to search and seize records that might be found at **TARGET LOCATION 1** and **TARGET LOCATION 2**, in whatever form they are found.  One form in which the records might be found is stored on a computer's hard drive or other storage media.  Some of these electronic records might take the form of files, documents, and other data that is user-generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

52.     I submit that if a computer or storage medium is found on the premises at **TARGET LOCATION 1** and **TARGET LOCATION 2**, there is probable cause to believe those records will be stored in that computer or storage medium, for at least the following reasons:

     a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.

14

Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

15

e.  Based on actual inspection of other evidence related to this investigation, spreadsheets, financial records, invoices and interviews with witnesses, I am aware that computer equipment was used to generate, store, and print documents used in the tax evasion scheme.  There is reason to believe that there is a computer system currently located on the premises at **TARGET LOCATION 1** and **TARGET LOCATION 2**.

53.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

54.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computer storage media can contain other forms of electronic evidence as well:

a.  Forensic evidence of how computers were used, the purpose of their use, who used them, and when, is, as described further in Attachment B, called for by this warrant.  Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can

16

record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance with particularity a description of the records to be sought, evidence of this type often is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information

17

necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge, that can allow the computer to be used by others, sometimes without the knowledge of the computer owner.  Also, the presence or absence of counter-forensic programs (and associated data) that are designed to eliminate data may be relevant to establishing the user's intent.  To investigate the crimes described in this warrant, it might be necessary to investigate whether any such malicious software is present, and, if so, whether the presence of that malicious software might explain the presence of other things found on the storage medium.  I mention the possible existence of malicious software as a theoretical possibility, only; I will not know, until a forensic analysis is conducted, whether malicious software is present in this case.

f.  Searching storage media for the evidence described in the attachments may require a range of data analysis techniques.  It is possible that the storage media located on the premises at **TARGET LOCATION 1** and **TARGET LOCATION 2** will contain files and information that are not called for by the warrant.  In rare cases, when circumstances permit, it is possible to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled

with criminal evidence.  For example, it is possible, though rare, for a storage medium to be organized in a way where the location of all things called for by the warrant are immediately apparent.  In most cases, however, such techniques may not yield the evidence described in the warrant.  For example, information regarding user attribution or Internet use is in various operating system log files that are not easily located or reviewed.  As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises at **TARGET LOCATION 1** and **TARGET LOCATION 2** for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

g.  Based upon my knowledge, training, and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment.  This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional

19

destruction.  Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

h.  The nature of evidence.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

i.  The volume of evidence.  Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime.  This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

j.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

20

      k.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

55.     In light of these concerns, I hereby request the Court's permission to seize the computer hardware, storage media, and associated peripherals that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the hardware, media, or peripherals on-site for this evidence.

## FINGERPRINT AND BIOMETRIC AUTHENTICATION

56.     I know from my training and experience, as well as from information found in publicly available information that some mobile devices such as Apple iPhones, Apple iPads, Samsung Galaxy's, and Samsung Notes offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") and/or facial/iris recognition (collectively, "biometric authentication") in lieu of a numeric or alphanumeric passcode or password.

57.     If a user enables the fingerprint feature on a given device, he or she can register several fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's touch fingerprint sensor. If the user enables biometric authentication, he or she can unlock the phone by holding it up to his or her face.

58.     In my training and experience, users of devices that offer the fingerprint sensor and/or biometric authentication often enable these features because they are considered to be more convenient ways to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a potentially more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

59.     In some circumstances, a fingerprint or biometric authentication cannot be used to unlock a device, and a passcode or password must be used instead.  These circumstances may include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked after several days. Thus, in the event law enforcement encounters a locked device, the opportunity to unlock the device via fingerprint or biometric authentication exists only for a short time.  These features may also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) multiple unsuccessful attempts to unlock the device are made.

60.     The passcodes or passwords that would unlock a given device is not known to law enforcement.  Thus, it will likely be necessary to press the fingers of the users of the device to the fingerprint sensor or hold the device up to the user's face in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  Attempting to unlock the devices with the use of the fingerprints or facial features of the user is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

61.     Based on the aforementioned facts and my training and experience, it is likely that PEACE and CRAIG are the users of the computers, cell phones and other devices and that their fingerprints and/or facial features are among those that are able to unlock the given device.

62.     Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of PEACE and CRAIG to the fingerprint sensors of a given device for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.  Furthermore, I request that the Court authorize law enforcement to hold the device up to the faces of PEACE and CRAIG so as to enable biometric authorization to unlock the given device if the former method is not enabled.

## CONCLUSION

63.     Based on the foregoing reasons, I believe CRAIG and PEACE are engaged in a tax fraud scheme to willfully attempt to evade the assessment of tax. I further believe that the contraband, property, evidence, fruits and instrumentalities of these offenses, are located in **TARGET LOCATION 1** and **TARGET LOCATION 2.** Therefore, I respectfully request that this Court issue search warrants for the locations described in Attachment A-1 and A-2 authorizing the seizure and search of the items described in Attachment B.

## **REQUEST FOR SEALING**

64.     I further request that the Court orders that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

_____
Max Sullivan
Special Agent
IRS-CI


Sworn to via telephone after submission by reliable electronic means pursuant to Fed. Crim. R. 4.1 and 41(d)(3) this 30th day of November, 2023.

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE